Good morning, Your Honor. Christina Hunt appearing on behalf of Cheryl Holland, the appellant in this case. This case revolves around whether or not the departure that Judge Whaley granted the upward departure was reasonable in light of what the facts and circumstances of the case were. This situation occurred because Ms. Holland pled guilty to conspiracy to possess with intent to distribute red phosphorous, which was a List I chemical. The offense occurred shortly after it became illegal to possess red phosphorous and shortly after it became a List I chemical, and before guidelines were promulgated to determine what the appropriate offense level was. Judge Whaley, in looking at this case, properly determined that the amount of red phosphorus that was distributed to Ms. Holland was the most applicable guideline. And I think that that was the applicable guideline. That was the applicable guideline, I believe. He didn't say it was the applicable guideline. It was the most analogous. Okay. That's different. But he treated it, though, as the applicable guideline. Yes, he did. That's what makes it the applicable guideline, most analogous. Pretty much. We're going to confuse you here. Go ahead. Okay. After he did that, he then determined that the amount of red phosphorous that Ms. Holland had was a substantial amount of red phosphorous, that it was responsible or could be responsible for the production of large amounts of methamphetamine. And in doing that, he really looked at the other guideline. There was one that had been proposed, but it had not yet gone into effect. 2D1.11 was to be revised. He looked at that guideline and then departed upward to what she would have received had this case occurred after that guideline had been proposed. And if I missed something here, he said, I'm not doing that. That would be an ex-post facula application of the law. And as a matter of fact, were I to start at 30, I'd depart upwards. Right. That's what he said. But that's We have to believe that he lied when he said that? Well, no. Bluntly, but is that what you're saying? Actually, I think the effect of what he did was to do precisely what he said he wasn't going to do. So if you look at He said it wasn't because he said that if they had started with 30, it would have gone up because 30 was actually for a like 150th as much red phosphorous. But what he does is he says in the record, if it had been I'm going to depart to a 30. If it had been a 30, I would have departed higher. But I think 30 is representative. And I base that on the amount of methamphetamine that can be used. So he did your client a No. I can't see that that's I'm looking for a way to really knock her on the head. But 30 seems to be fair under these facts and circumstances. Well, under that theory, then if if we had if he had used 2D 1.11 as proposed and then departed upward from the 30, you basically have the same problem. So what exactly are you asking us to do? Remand the case and tell the judge what that the upward part that the upward departure, the extent of that departure was unreasonable. Why was it unreasonable? It was unreasonable because for two reasons. First of all, the actual application or the manner in which he did that truly did violate the ex post facto. So we have to tell him you lied to us. I mean, I hate to be blunt, but that's he said he's not doing that. Except that by his actions, he did do that. Well, he was trying to figure out how the extent how far could you go up? And it looks to me what he did was he relied upon the potential quantity of meth that could be produced. Correct. And then he was looking more at 2D 1.1, the quantity tables for meth, even though 2D 1.1 applies to actual manufacturing and whatnot. And it appears that he did do that. It looks like he was trying to avoid applying the new intended guideline for red phosphorus. The amendment to 2D 1.11 seemed to be effective. Right. But even But that he was concerned, he emphasizes that the large quantity of meth that could be produced with 90 pounds of red phosphorus. Well, but even so, he had also already made a determination that 2D 1.1 was not analogous, that one could not determine how much. It was not analogous. That's correct. Because that was a manufacturer. That would relate to manufacturing, actual production. Right. But, you know, he's searching for some basis on which to determine what would be the appropriate extent of his upward departure. Now, it is kind of strange. I'm kind of somewhat sympathetic to your position that he ends up with level 30, which is the same for the proposed modification to 2D 1.11. But, you know, what is a district court judge supposed to do? Well, I think the problem is, is that when you look at this case, he determines that the analogous guideline, the applicable guideline, 2D 1.12, is the appropriate guideline to use. He then quadruples, basically, his sentence. He found that, but he also observed that this was an extraordinary amount of red phosphorus. So he wants to account for that in some fashion, i.e., it was outside the heartland because it was so much red phosphorus, of any of the guidelines, because it was so much red phosphorus. So then what does he do next? Except that the problem is, is that there was no real finding of fact of why this was so — why this could be determined to be so much red phosphorus. He looks at 2D 1.1, and he admits that he doesn't — I mean, that — that, I think, was where the translation to the methamphetamine was of some relevance, which is that if you look at how much methamphetamine it translates into, it was an amount that would be way, way above the — the guideline that he was using, or that he could have used. Except that he makes the comment that to use 2D — when he determines that 2D 1.1 is non-analogous, he makes the comment, you can't really determine how much methamphetamine can be produced using this red phosphorus. Because of the — The odd thing here is that he used the analogy to — to .12 because he said it was more like a flask because it wasn't a reactant. But wasn't putting it in List I at all a finding that it was like the reactants? I mean, isn't that what the difference between List I and List II is? Well, the difference between List I and List II, as I understand it, is List I chemicals are essential to the production and become a part of the methamphetamine. And somehow by doing this analogy, he was finding that it wasn't because his analogy was really that it's more like a flask than a reagent. And in a way, again, so you sort of lucked out there because by being a List I chemical wasn't there to determine — quite aside from the guidelines, but List I had already occurred, right? Right. And a List I was treating it as not like a flask, but really more like a — a — a reagent or catalyst. Except that the — It's reusable, isn't it? Isn't that part of the problem? It is reusable. And the — but the expert testimony was also that it was improperly categorized as a List I. But it was categorized. It was categorized, but it's — it was improperly done because it really is just a reagent or catalyst. And that's the point that he was deciding that it was a List I chemical and it wasn't a reagent. It wasn't. Therefore, it was treated as a reagent. And therefore, by analogizing it to a List I chemical — to methamphetamine, he was doing exactly what the implication of it being a List I chemical would suggest. Except that he made the determination that he couldn't make those calculations because they were too iffy. They would be ad hoc calculations to — to do the analysis as a how much meth could be produced. But when you're dealing with these huge numbers, it would — the translation is made a lot easier, isn't it? But that was not what the testimony was. Do you want to save some time? I do. Thank you. Again, Ron Skibbe for the government. At the time of the sentencing, obviously it was a difficult position for all of us to be in as to decide how to approach this case with red phosphorus not being listed in the guidelines. I believe that Judge Whaley's finding that the base offense level was 30 is correct. But obviously the question before the Court is whether 2D1.12 is the correct way to go about it, or if under O'Farrell the suggestion is or the direction is that the statutory index must be utilized by the Court in choosing the appropriate guideline. If that is the case, then 2D1.11 would be the guideline that Judge Whaley would have used. But he had observed that he would end up in the same place, which is what the relevance of the observation is. Your Honor, I think they would both be appropriate. To either use 2D1. I guess the question I have in my mind is whether this Court is going to feel that under O'Farrell this case calls for a remand because the statutory index must have been used. And I'm trying to address that possibility. In either situation, however, under 2D1.11 or 2D1.12, the way Judge Whaley went about it, I believe it was reasonable and there was no abuse of discretion and that was the appropriate base offense law. Was there – I can't remember. I thought there was some testimony about it's not exact quantities, but one pound of red phosphorus could produce 2 to 3 pounds of metal. That's correct, Judge. That's exactly correct. Dr. Chappell. He didn't want to give an exact estimate because it depended upon the quality of the chemicals used to manufacture it. Correct, Judge. The amount of iodine and other precursors that were used. However, he did indicate, Dr. Chappell did indicate that his estimates were very conservative. It would be at least double the amount of red phosphorus. In other words, a 1 to 2 ratio and more probably 1 to 3. Okay. Thank you, Counsel. Do you have anything to add? No, Your Honor. The case just argued stands submitted. Thank you both. United States v. Antonio Manuel Gallardo.
judges: Trott, Paez, Berzon